Andrew M. Calamari
Sanjay Wadhwa
George N. Stepaniuk
Richard Hong
Ladan F. Stewart
Chevon N. Walker
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
200 Vesey Street, Suite 400
New York, NY 10281-1022
(212) 336-0956 (Hong)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : | |
| | : | Civil No. |
| Plaintiff, | : | |
| | : | ECF CASE |
| -against- | : | COMPLAINT |
| | : | |
| KEE CHAN, | : | |
| | : | |
| Defendant. | : | |

Plaintiff Securities and Exchange Commission (the "Commission") alleges the following against defendant Kee Chan ("Chan" or "Defendant"):

## SUMMARY OF ALLEGATIONS

1.    This case involves fraud committed by Chan while buying and selling commercial mortgage backed securities ("CMBS") during the time he was co-head of the CMBS trading desk ("CMBS desk") at Nomura Securities International, Inc. ("Nomura").

2.    Chan acted as an intermediary on trades with Nomura's customers who sought to buy and sell CMBS on the secondary market, with Nomura buying the CMBS from one

customer and then selling the same CMBS to another customer at a higher price.  On numerous

occasions from 2010 through March 2012 (the "relevant period"), Chan, while engaged in such

trading for Nomura, deliberately misled and lied to customers about, among other things, (i) the

prices at which Nomura had bought or sold the securities; (ii) the bids and offers that Nomura

made or received on the securities; (iii) the compensation that Nomura would receive for

intermediating the trades, in the form of the difference, or "spread," between its purchase and

sale prices; and/or (iv) who owned the security, often pretending that he was still negotiating

with a third-party seller when Nomura had, in fact, already acquired the security.

3.     In addition to knowingly or recklessly misrepresenting material price information,

Chan embellished his lies by repeatedly describing to customers, who were negotiating to buy

CMBS from him, colorful but entirely fictitious exchanges he supposedly just had with

customers who were purportedly still negotiating to sell that security to Chan.  In at least one

instance, Chan went so far as to alter and then forward to a customer an internal Nomura email in

order to "corroborate" Chan's lie about what Chan had bid for the security.

4.     Chan defrauded investment advisers and other fund managers that were trading

CMBS on behalf of clients to whom such advisers and managers owed fiduciary and other duties

to obtain the best possible price, as well as financial institutions that were trading CMBS for

their own proprietary accounts.  The prices at which Nomura's customers bought and sold the

CMBS at issue, and the amount of compensation that they thereby agreed to provide Nomura,

were material to the customers and investors, and the trading profits for the CMBS desk on those

trades were inflated by Chan's fraudulent conduct.

5.     Through his fraudulent conduct, Chan generated hundreds of thousands of dollars

in additional, ill-gotten trading profits for the CMBS desk, which thereby increased his own

compensation.  Chan received discretionary bonuses during the relevant period that were based, in part, on the performance of the CMBS desk.

6.       By virtue of the conduct alleged herein, Chan, directly or indirectly, singly or in concert, violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §§ 240.10b-5].  Unless Chan is permanently restrained and enjoined, he will again engage in the acts, practices, transactions and courses of business set forth in this Complaint and in acts, practices, transactions and courses of business of similar type and object.

7.       For these violations, the Commission seeks a final judgment against Chan ordering permanent injunctive relief, disgorgement with prejudgment interest, civil monetary penalties, and such other relief as the Court deems just and proper.

## JURISDICTION AND VENUE

8.       The Commission brings this action pursuant to authority conferred by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)], Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)], Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

9.       This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), 22(a), and 22(c) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d),77v(a), 77v(c)]; and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

10.       Venue is proper in this District pursuant to Section 22(a) of the Securities Act [15 U.S.C. §77v(a)] and Section 27 of the Exchange Act [15 U.S.C. §78aa].  Many of the acts, practices, events, transactions, communications, courses of business and other matters alleged

herein occurred in the Southern District of New York, including the material misrepresentations made by Chan and the CMBS trades that occurred in connection with those misrepresentations.

11.     In connection with the conduct alleged in this Complaint, Chan, directly or indirectly, singly or in concert, has made use of the means or instruments of transportation or communication in, and the means or instrumentalities of, interstate commerce, or of the mails.

## DEFENDANT

12.     **Chan**, age 46, is a resident of Manhasset, New York.  He was associated with Nomura as a registered representative from August 2009 through June 2012.  During this time, Chan was one of two head traders on Nomura's CMBS desk in New York, New York, and held the position of Managing Director, Fixed Income, Securitized Products Trading, Americas. After leaving Nomura, Chan was associated as a registered representative with another broker-dealer through February 2016, when he was terminated.  Before joining Nomura, Chan was associated with at least four other broker-dealers as a registered representative or in another capacity, beginning in 1990.  During his career in the securities industry, Chan held Series 7, 24, and 63 licenses.  When subpoenaed for documents and testimony in the Commission's investigation, Chan asserted his Fifth Amendment privilege against self-incrimination.

## RELATED ENTITY

13.     Nomura, a New York corporation with offices in New York, New York, is a U.S. affiliate of Nomura Holdings, Inc., a public Japanese financial holding company with a principal place of business in Tokyo, Japan.  Nomura has been registered with the Commission as a broker-dealer since 1969 and as an investment adviser since April 2012.

## CHAN'S KNOWLEDGE OF NOMURA'S POLICIES

14.     As a Managing Director at Nomura, Chan received and was otherwise aware of the relevant policies and training materials relating to integrity and accuracy in customer communications when he engaged in the misconduct alleged herein.  One such policy, included in the Compliance Manual for Nomura's Fixed Income Division (of which the CMBS desk was a part), provided as follows:  "All communications with clients (or prospective clients) must be truthful, fair and balanced.  Communications must provide a sound basis for evaluating the facts concerning any particular security or type of security, industry or service.  Communications should never contain false, misleading, unwarranted or exaggerated statements, forecasts, opinions or claims."  Another such policy, included in the Compliance Manual for Nomura Holdings America (of which Nomura was a subsidiary), similarly provided:  "In every context, communications with the public, whether oral, written or electronic, must be based on principles of fair dealing and good faith and should provide a sound basis for evaluating the facts regarding any particular investment, industry discussed or service offered.  All communications must be truthful, balanced and in good taste, must not omit material facts and must not use language that is misleading, promising, or exaggerated."

15.     Despite his knowledge of the foregoing policies and the requirement that he comply with those policies, Chan deliberately lied to customers to inflate the profits of the CMBS desk and thereby line his own pocket, as detailed below.

## CHAN'S FRAUDULENT CONDUCT

**Background**

16.     Chan was one of the two head CMBS traders for Nomura during the relevant period, during which time Nomura was a dealer in CMBS.  Chan jointly ran the CMBS trading desk with the other head trader from August 2009 until Chan's departure in June 2012.

17.     CMBS are a type of asset-backed securities whose underlying assets are commercial real estate loans.  CMBS are debt obligations and are commonly referred to as bonds.  CMBS were illiquid securities, many of which had been discounted significantly as a result of the 2008 financial crisis.  Starting in 2010, as the economy began to recover, trading volume in the secondary markets for CMBS increased significantly.

18.     The CMBS secondary market was opaque because there was no contemporaneous public dissemination of trade prices, and purchasers and sellers of CMBS had no reliable way to learn the prices that dealers like Nomura brokers paid and received unless the dealers disclosed them while negotiating a trade.  The opaque nature of the secondary market also made investors dependent on dealers like Nomura in locating other buyers and sellers of CMBS.

19.     CMBS prices are typically expressed as a percentage of the face value of the subject bond and the operative increments are expressed in "points" and "ticks," which are equal to 1/32 of a point (or one thirty-second of one percent).  For example, CMBS priced at 70-16 (70 and 16 ticks) means that the price is 70.5% of the bond's face value.

20.     Nomura's CMBS customers were generally investment advisers and other firms that managed funds that invested in CMBS and other asset-backed securities, and also included other broker-dealer firms that invested in such securities for their own accounts.

21.     Chan typically intermediated trades between buyers and sellers of CMBS, with

Nomura buying the CMBS for its own account from one customer and then selling the same CMBS to another customer. On such trades, Chan often negotiated Nomura's purchase of CMBS from one customer and subsequent resale to another customer on the same day.

22.     Chan generated a profit for Nomura by buying and selling the security and collecting the "spread" (or difference) between Nomura's purchase and sale prices, which he negotiated separately, but often simultaneously, with each counterparty.

23.     In these circumstances, Nomura was typically trading the CMBS as a principal, but Nomura would generally own the bond for only a limited period of time, and sometimes just momentarily. Nomura therefore had minimal, if any, true investment risk, because Chan typically knew that he would be immediately trading that bond to another customer. Nomura's counterparties usually agreed to compensate Nomura less for such low-risk, intermediated trades than for trades in which Nomura had taken on more significant risk.

24.     During trade negotiations, Chan often conveyed to one or both counterparties the other customer's bids to buy or offers to sell the bond, the prices at which Nomura had bought or sold the bond, and/or the spread (also sometimes referred to by CMBS traders as "commission") that Nomura would realize from buying and selling the bond. Chan's objective in these negotiations was to secure both sides of the trade and maximize Nomura's compensation by maximizing the spread. The customers' objective generally was to acquire or sell the bond at the best price while still providing Nomura with a reasonable spread (*i.e.* amount of compensation) for intermediating the trade.

25.     Based on Chan's representations, a potential buyer would often agree to compensate Nomura by paying Nomura an amount above, or "on top" of, the price at which Nomura would be purchasing (or had purchased) the security, and/or the potential seller would

sometimes agree to compensate Nomura by selling the security at a price below the price at which Nomura was able to sell the security to the potential buyer. Chan could increase the overall spread for Nomura by obtaining compensation from both counterparties in this manner. In these types of situations, Chan expressly negotiated the spread that Nomura was to receive with either the buying or selling customer and, in some cases, with both customers simultaneously.

26.     For example, if Chan told a potential buyer that Nomura had just bought (or could buy) a bond at 70, the customer might agree to pay Nomura a quarter point (or 8 ticks) by buying the security from Nomura at 70.25 (or 70-08, expressed in ticks). Conversely, if Chan told a potential seller that another customer would buy the security at 71, the potential seller might also (or instead) agree to pay Nomura a quarter point (or 8 ticks) on that side of the trade by selling the security to Nomura for 70.75 (or 70-24, expressed in ticks).

27.     In other situations, Nomura and the customer instead negotiated an "all in" price for the security that was intended to include a certain spread for Nomura, often still based, however, on what Chan had represented to the customer about Nomura's acquisition cost (or about Nomura's current bid price and/or the seller's current offer price).

28.     Chan's negotiations with Nomura's customers often occurred through electronic communications, typically instant messages or Bloomberg chats and occasionally email (which are the sources of all the trade negotiations quoted herein).

29.     The information that Chan communicated to Nomura's customers during his negotiations to buy and sell CMBS was material to the customers and to the outcome of the negotiations. Because CMBS are illiquid securities and the market for them is opaque, dealers in CMBS decide if, when and to whom to disclose the bids and offers that they receive or make and

the prices at which they buy and sell the securities.  When Chan made statements to Nomura's

customers about Nomura's acquisition or sale price (and by implication, the price at which other

market participants were willing to transact in a bond), or about the all-in price of a CMBS trade,

the customers used that information to inform their own bids and offers and the prices at which

they agreed to buy and sell CMBS in their negotiations with Chan.  As such, the statements at

issue here conveyed information that would be important to a reasonable investor, and that was,

in fact, important to Nomura's customers, because those statements significantly altered the total

mix of available information.

**Chan's Material Misrepresentations and Deceptive Conduct**

30.     In numerous instances from 2010 through March 2012, Chan lied to customers

about bids and offers that he made or received for the bonds at issue, the prices that Nomura paid

or received when it bought and sold the bonds and/or Nomura's spread on the trades.  Chan

knowingly or recklessly engaged in this fraud in order to inflate Nomura's spread on the trades

without the customers' agreement to, or knowledge of, the actual spreads.  The transactions at

issue generated hundreds of thousands of dollars in additional, fraudulent profit for the CMBS

desk attributable to materially false and misleading statements knowingly or recklessly made by

Chan to Nomura's customers.

31.     In many instances, Chan fraudulently induced customers buying bonds from

Nomura to increase their bids and to pay more for the bonds than they otherwise would have by

falsely telling them that Nomura would be buying, or had bought, the bonds from another

customer at a price that was higher than the selling customer's actual offer or the price Nomura

had bid or paid.  By lying about these prices, Chan misled his customers about, among other

things, the amount of compensation that Nomura would receive on the transaction.  On some

occasions, the customer expressly agreed on the amount of Nomura's compensation based on, and to be paid "on top" of, the fictitious higher purchase price that Chan falsely represented he had paid or needed to pay.

32.     Chan also fraudulently induced customers selling bonds to Nomura to lower their offers and accept less for the bonds by falsely conveying lower bids or sale prices to them than he had actually received from the customers that were seeking to buy the bonds from Nomura. In some instances, he increased the spread by lying to both the buyer and the seller about the other party's bid or offer.

33.     In other instances, Chan deceived customers by falsely stating, or otherwise misleading customers into believing, that Nomura was still actively negotiating to buy the bonds at a certain price, when Nomura had already purchased the bonds earlier in the day at a lower price than the price at which he falsely told the customers he was seeking to buy the bond.  In these situations, Chan provided the buyer with completely fabricated accounts of the status of the purportedly ongoing negotiations with the seller, including false bid and offer prices and other fictitious (and often colorful) details.

34.     As a result of each of the foregoing assorted types of lies, Chan deceived and misled customers into believing that Nomura was receiving less of a spread than it actually was receiving and, in some instances, he expressly misstated the specific amount of the spread.

35.     Chan made misrepresentations that falsely implied and, in some cases, expressly misstated spreads ranging from 0.125 to 1 point (4 to 32 ticks), while Nomura's actual spreads were up to 8 times more than the implied, misstated, or expressly agreed upon spreads.

36.     The matters about which Chan lied were important to the defrauded counterparties and affected their price decisions, negotiating strategies, the price at which the

counterparties ultimately bought or sold the CMBS, and/or the amount of compensation that they actually paid to Nomura. The misrepresented information thereby had a material impact on the counterparties' decision-making process and price negotiations, leading them to bid and pay higher (or offer and obtain lower) prices for the securities than they would likely have done if Chan had not misrepresented, in various ways, the size of the spread that Nomura was obtaining for intermediating the trades at issue.

37.     Chan's material misrepresentations and other deceptive misconduct were deliberate and, by engaging in such conduct, he violated the above-mentioned Nomura internal policies and acted contrary to the standards of conduct set forth in the compliance training that he received at Nomura, which required all communications with counterparties and other customers to be truthful and prohibited false, misleading or exaggerated statements to customers and other members of the public.

### Examples of Chan's Specific Misrepresentations and Deceptive Conduct

38.     In numerous transactions, Chan deliberately made materially false and misleading statements to (i) the purchasing counterparty about Nomura's purchase price or bid, the seller's offer and/or Nomura's spread after Chan had already purchased or agreed to purchase the bonds at a lower price, thereby inducing the buyer to purchase the bond from Nomura at a higher price; and/or (ii) the selling counterparty about the price at which Nomura's buyer was bidding for the bond and the amount of Nomura's compensation, thereby inducing the seller to sell the bond to Nomura at a lower price. In one instance, Chan even altered an internal email to make it appear to corroborate the amount of the bid that he told a counterparty he had made for the bond that the counterparty was purchasing from Nomura.

39.     The specific instances in which Chan engaged in such fraudulent conduct include

the following transactions, through which he generated a total of at least $391,407 in additional, ill-gotten profits for the CMBS desk.

**Trade 1**

40.     In Nomura's January 23, 2012 sale of a bond denominated CMSC 2006-C5 AJ to an investment manager ("Investment Manager A"), Chan defrauded Investment Manager A by giving a trader for Investment Manager A ("Trader A") a fabricated account of Chan's purportedly ongoing negotiations with the seller of the bond and then lying about the price at which Nomura had purchased the bond.

41.     The transaction began with an initial communication to a Nomura salesperson by the seller of the bond, inquiring about the possibility of having Nomura sell it at "around" 65 to the same investment manager (Investment Manager A) to which Nomura had sold a different portion of the bond the prior week.  The Nomura salesperson, in turn, reported to Chan that the seller "wants to know our thoughts on where we could trade this to the [fund manager] we sold to last week.  Wants to be around a $65area."  Chan reached out to Trader A about 90 minutes later, at 3:05  p.m., asking if he would be interested in purchasing another piece of the bond ("u care on any more size?").  Trader A responded that he would potentially be interested.  No more than 15 minutes later, as reflected in a trade ticket time-stamped at 3:21 p.m., Nomura purchased the bond in question at 64.5 (or 64-16, expressed in ticks).

42.     Two minutes later, at 3:23 p.m., Chan went back to Trader A about the bond and told him that "i can sell you [the bond] basically at 66-26."  Having received no response from Trader A, Chan followed up a few minutes later, stating "have guy asking on the bonds…u think u gonna care."  Chan knew that his statement was false, as Nomura had already purchased the bond at 64.5 and Chan was no longer negotiating with the seller, *i.e.*, there was no "guy asking

on the bonds" at that point.  Trader A then expressly asked Chan whether Nomura already owned

the bond or was looking to intermediate the trade, to which Chan responded:  "bot it…i think i

stole em…i bot em at 65-16…before he puts on [bid wanted in competition]… showed 65…he

wanted 66…i just split em."  This string of statements was also a lie.  Not only had Nomura

already purchased the bond earlier that day at 64.5 — a full point lower than what Chan told

Trader A he had paid — but the negotiations that Chan described were completely made up.

43.     Trader A agreed to buy the bond at 66.5, intending to provide Nomura with a one

point spread by paying one point more than what he understood Nomura had paid for the bond.

Showing the importance of the misrepresented price information to Trader A in his negotiations

with Chan, Trader A told Chan:  "i know u would like to make more than a pt but i'm trying to

be disciplined here."  In reality, Chan made two points on the trade by deliberately

misrepresenting to Trader A that Nomura had paid 65.5 for the bonds, when it had actually paid

64.5.  The extra point in the spread resulting from Chan's material misrepresentations and

deliberate deception resulted in additional, fraudulent profit of $87,500 for the CMBS desk at

Investment Manager A's expense.

44.     As shown above, Chan's misrepresentations were material because, among other

things, the price information that Chan lied about, coupled with his fabricated account of a

purportedly ongoing negotiation with the seller, was important to and influenced Investment

Manager A's bidding strategy and affected the price that Investment Manager A agreed to pay,

and paid, for the bond.

### Trade 2

45.     In Nomura's September 28, 2010 sale of a bond denominated JPMCC 2007-LD11

AM to a financial services firm ("Financial Firm 1"), Chan defrauded Financial Firm 1 by lying

and giving a trader for Financial Firm 1 ("Trader 1") a fabricated account of Chan's purportedly ongoing negotiations with the original seller of the bond when Nomura had, in fact, already bought the bond at a substantially lower price than the price that Chan falsely claimed the seller was asking.

46.     The transaction with Financial Firm 1 occurred as follows:  Approximately 30 minutes after negotiating Nomura's purchase of the bond at 81, Chan reached out to Trader 1 to ask if Financial Firm 1 would be interested in purchasing that bond.  Falsely indicating that he *may* be able to obtain the bond, which Chan had already purchased, Chan told Trader 1: "thinking I can bring some out.  10mm."  When Trader 1 asked Chan the price, Chan replied, "somewhere between 81 and par."  Trader 1 responded with a bid of 81.1, following which Chan stated:  "fk [that]…i have 81-16 bid myself…let me see where this shakes out…but just wanted to see if you had $ to spend you cheap fk."  This series of statements was a lie.  Since Chan had already purchased the bond earlier that day at 81, Chan knew that his statements about having a live bid in for the bond at 81-16 (or 81.5) and waiting to see how the situation "shakes out" with the seller were completely false.

47.     A couple of minutes later, Chan came back to Trader 1 with: "10mm at 82-16." Trader 1 asked if "thats your offer?" and Chan again responded with a lie: "thats where i can buy 10 from guy."  Chan had already bought the bond, and at a price of 1.5 points less than what he was telling Trader 1 the seller was supposedly seeking.  Trader 1 responded:  "see if you can get em to us at 82.5" and continued:  "i thot the most i'd pay was 82…and dont really wanna pay 82.5…and certainly dont wanna pay on top of 82.5."  Chan responded:  "gotcha…let me chisel the guy."  Five minutes later, Chan came back to Trader 1:  "that is done…we can sell u $10 at 82-16."  Chan's statements were again a complete fabrication.  Having already bought the bond

at a much lower price, Chan knew that he did not need to "chisel" or engage in any further

discussion at all with the seller. Trader 1 then bought the bond from Chan at 82.5, or 1.5 points

higher than the price at which Chan had bought the bond from the seller about an hour earlier

and before this entire series of exchanges with Trader 1 even began. Chan's material

misrepresentations and deliberate deception resulted in additional, fraudulent profit of $125,000

for the CMBS desk at Financial Firm 1's expense.

48.     As shown above, Chan's misrepresentations were material because, among other

things, the price information that Chan lied about, coupled with his fabricated account of a

purportedly ongoing negotiation with the seller, was important to and influenced Financial Firm

1's bidding strategy and affected the price that Financial Firm 1 agreed to pay, and paid, for the

bond.

### Trade 3

49.     In Nomura's March 26, 2012 sale of a bond denominated CGCMT2004-C2H to

an investment manager ("Investment Manager B"), Chan defrauded Investment Manager B by

giving a trader for Investment Manager B ("Trader B") a fabricated account of Chan's

negotiations with the original seller of the bond and lying about the price at which Nomura had

bid for the bond. When Investment Manager B then questioned the veracity of Chan's statement

about his bid to the seller, Chan sent Investment Manager B an altered version of an internal

email that Chan had previously sent with Nomura's bid. Chan's altered version of the email

showed the fictitious higher bid that Chan had represented to Investment Manager B, rather than

the true lower bid stated in the email that Chan had actually sent.

50.     In this transaction, approximately 20 minutes after Chan submitted what would

turn out to be a successful bid for a $1.5 million piece of the bond at 51-01, Trader B asked Chan

whether he could bid to purchase the bond. Chan responded, "guess so…im in already." When Trader B asked where Chan had bid, Chan falsely responded "51-05." Chan went on to state, "don't think thats a winner," conveying the false impression that an even higher bid would be needed to acquire the bond. Trader B then responded: "52/…pay u on top." But Chan never raised his bid above 51-01, and Nomura acquired the bond at that price.

51.     As shown above, Chan's false statement led Trader B to agree to pay Nomura an amount above 52 for the $1.5 million piece of the bond that Nomura wound up buying at 51-01, and Trader B believed, at the time, that only that portion of the price which exceeded 52 would be the amount of Nomura's compensation. As Chan said to him at one point later on, "you said u would pay off 52."

52.     Approximately 40 minutes after Trader B agreed to pay 52 and compensate Nomura "on top" of that amount and when Nomura's acquisition of the bond was complete, Chan told Trader B, "we bot it." Chan did not, however, tell Trader B that it was Nomura's original (misrepresented) bid that had been accepted, rather than the even higher bid that Chan had suggested would be necessary and that Trader B had made. Expressing a concern that Investment Manager B would now be overpaying for the bond by paying Nomura "on top" of 52, Trader B responded: "cool…i bet the 51-05 was already good…u want some of it? Feel like we got smoked on this one." Showing again the importance to their negotiations of the bid price information misrepresented by Chan, Trader B went on to say that his partner wanted to modify the trade, stating to Chan: "between u and me basically [Trader B's partner] is certain u made up that u bid 51-05 already in order to get us to bid."

53.     A short while later, Chan sent an email to Trader B purportedly forwarding an earlier internal Nomura email from Chan that seemed to corroborate Chan's 51-05 bid. The

email forwarded by Chan was a fake.  In fact, Chan fabricated the phony email from an actual email that he had sent internally earlier in the day, altering the bid price from 51-01, which appeared in the actual email, to 51-05, the price that Chan told Trader B he had bid for the bond.

54.     Investment Manager B continued to negotiate with Chan, and Chan ultimately agreed that Nomura would adjust the trade such that Investment Manager B would buy only a $500,000 piece of the bond from Nomura, with the rest of it coming back to Nomura.  Even at this smaller size, Chan's material misrepresentations and deliberate deception generated $13,281 in additional, fraudulent profit for the CMBS desk at Investment Manager B's expense.

55.     As shown above, Chan's misrepresentations were material because, among other things, the price information that Chan lied about, coupled with the phony email, was important to and influenced Investment Manager B's bidding strategy and affected the price that Investment Manager B agreed to pay, and paid, for the bond.

**Trade 4**

56.     In Nomura's August 16, 2011 purchase of a bond denominated LBUBS 2005-C3 AJ from a financial services firm ("Financial Firm 2"), Chan defrauded Financial Firm 2, first by lying to the trader for Financial Firm 2 ("Trader 2") about the bid that Chan had received for the bond, and then by giving that trader a fabricated account of Chan's purportedly still ongoing negotiations with the buyer when, in fact, the buyer had already agreed to purchase the bond from Nomura at a price substantially higher than the price that Chan falsely claimed the buyer was bidding.

57.     In this transaction, the traders expressed the price of the bond in terms of what is known as its "nominal yield spread."  Under this approach, the higher the nominal yield spread on a bond (generally introduced with the prefix "N+"), the lower its price, and vice-versa.

58.     The transaction began with Chan reporting to Trader 2 about Chan's efforts to
find a buyer for the bond, as follows: "following up on lbubs...i put the screws on a few
[people] and expecting to hear back...they are working off my mkt from yest 850/750...thats
kind of context where u are thinking right just so we are on same page." Trader 2 responded,
"yes sir." Shortly thereafter, Nomura received a bid of N+825 (or 87-4) for the bond, which
represented a higher price than the N+850 (or 86-14) referenced in the prior exchange.  One
minute after receiving this higher bid, Chan went back to Trader 2 and pushed him to *lower* the
price at which Financial Firm 2 would sell the bond to Nomura, asking "you have room behind
850?"  Trader 2 responded that he had "10-15 bps" of room, to which Chan replied, "trying to
get them to 850 and firm up," which Chan knew was a lie because he already had a bid (N+825
or 87-4) that was better than N+850 (or 86-14).

59.     Ten minutes later, the buyer with whom Chan was negotiating agreed to pay an
even better price than its initial bid of N+825 for the bond—N+815 (equivalent to a price of 87-
13).  Chan immediately went back to Trader 2 and, pretending that Chan was still negotiating
with the buyer to get a better price for the bond, again pushed Trader 2 to lower Financial Firm
2's sale price to Nomura by lying: "can pay u 85-24...maybe I can get him a little better." 
Trader 2 responded, "if you can get him better, pls do...otherwise...just do it."  One minute later,
Chan came back to Trader 2 with "85-28," a bid that was somewhat higher than 85-24 but still
well below the 87-13 price that Chan had already secured for the bond.  Trader 2 agreed to sell
the bond to Nomura at 85-28, giving Nomura a spread of 1.5313 points, or 49 ticks, in
compensation for this virtually risk-free trade.

60.     Chan's material misrepresentations and deliberate deception generated $128,126
in additional, fraudulent profit for the CMBS desk on this transaction at the expense of Financial

Firm 2.

61.     As shown above, Chan's misrepresentations were material because, among other

things, the price information that Chan lied about, coupled with his fabricated account of a

purportedly ongoing negotiation with the buyer, was important to and influenced Financial Firm

2's negotiation strategy and affected the price at which Financial Firm 2 agreed to sell, and sold,

the bond.

### Trade 5

62.     In Nomura's October 28, 2011 purchase and sale of a bond denominated GECMC

2007-C1 AM, Chan again defrauded Financial Firm 2, as well as the other counterparty on the

trade, an investment manager ("Investment Manager C"), by lying repeatedly to Trader 2 (from

Financial Firm 2) who sold the bond to Nomura about the other trader's bid and purchase price

and by lying to both traders about Nomura's compensation on the trade.

63.     The transaction began with Trader 2, the owner of the bond, saying to Chan, "lets

try and boot [*i.e.*, sell] those gecmc this morning."  Chan responded:  "I only have 1 dude caring

on that name," meaning that Chan knew only one party interested in purchasing the bond.

Approximately three hours later, Chan received a bid of N+965 (expressed as a nominal yield

spread and equivalent to a price of 78-06) for the bond from a trader for Investment Manager C

("Trader C"), confirmed through the following exchange:  Chan stated, "to be clear, you are 965

bid for 10mm gecmc am," and Trader C responded, "Yes, crystal clear."

64.     Just one minute later, Chan lied to Trader 2 about Trader C's bid, falsely stating

"gecmc guy is 975 bid today," reflecting a price of 77-27¾.  This statement falsely conveyed a

bid that was lower in value than Trader C's bid, as the true bid of N+965 reflected a higher price

(78-06) for the bond than the phony N+975 bid that Chan conveyed to Trader 2.  Trader 2

responded to Chan: "what do you think of that level. still probably a good idea to smack [*i.e.*

accept] that given how much is out there." Chan replied: "im pissed I [wasn't] more forceful

yesterday and wack [*i.e.* try to increase] his bid…but yes…i think you should still sell it." Chan

added: "if i cant get him to pay me…can you pay off the 975," to which Trader 2 responded,

"sure." In other words, Chan succeeded in getting Trader 2 to agree to compensate Nomura

based on the false, lower bid price by, in part, pretending to be disappointed in himself for not

having tried to get a better bid from Trader C — when Trader C had, in fact, made a better bid —

and telling Trader 2 that Financial Firm 2 should nevertheless accept the phony, lower price and

reduce it even further for Nomura to obtain any compensation at all on the entire trade.

65.      One minute later, Chan countered Trader C's N+965 bid with an even higher

offer: "10mm GECMC 07-C1 AM at 78-16 to you if that works…that's [N+]956." Trader C

responded with the same bid that he had made before, N+965 (or 78-06). Even though Trader 2

had already agreed to accept substantially less for the bond (an amount sufficiently lower than

N+975 to also provide Nomura with compensation), Chan falsely claimed that he needed a

higher price from Trader C for Nomura to be compensated at all, telling that trader "im trying to

get paid a scrap." Chan then asked Trader C whether he would be willing to pay Nomura four

ticks on top of Investment Manager C's purchase price. Trader C first responded that the other

counterparty should be the one to pay the four ticks of compensation to Nomura, and then

ultimately agreed to split the difference and pay two ticks, telling Chan: "I pay 2 ticks, he pays 2

ticks."

66.      As a result, Investment Manager C agreed to buy the bond from Nomura at a price

of 78-08, with Trader C believing that Nomura's total spread on the trade would be a total of

four ticks, with Investment Manager C paying half of that compensation amount. However,

immediately after securing Trader C's agreement to pay 78-08 for the bond, Chan went back to

the Trader 2 and lied yet again about both the other counterparty's purchase price and the need

for Trader 2 to reduce his price to provide Nomura with any compensation at all.  This time,

Chan falsely told Trader 2 that the other counterparty had agreed to buy the bond for only 77-

27¾ and that Trader 2 needed to sell the bond to Nomura for even less than that in order to

provide Nomura with at least some amount of compensation, stating to Trader 2, "you pay on top

so reduce it."  Trader 2 replied "yep, let me know whats fair for your hard work," to which Chan

responded, falsely in the context of this trade, that "guys have been paying me 8 ticks."  Trader 2

then agreed to sell the bond to Nomura at 77-20 in order to create a spread of nearly eight ticks

between that price and the 77-27¾ that Chan had falsely represented to be the price that Nomura

was receiving for the bond from its purchaser, who was purportedly not providing any

compensation at all to Nomura.

67.     In fact, Chan obtained a total spread of 20 ticks for Nomura on this transaction

through his repeated lies and deception of both Trader 2, who thought Financial Firm 2 was

paying only eight ticks and that the other counterparty was paying nothing, and Trader C, who

thought that he was paying two out of a total of four ticks in overall compensation for Nomura.

Chan's material misrepresentations and deliberate deception generated $37,500 in additional,

fraudulent profit for the CMBS desk on this transaction at the expense of Financial Firm 2 and

Investment Manager C.

68.     As shown above, Chan's misrepresentations were material because, among other

things, the price information and compensation amounts that Chan lied about were important to

and influenced the negotiation strategies of Financial Firm 2 and Investment Manager C and

affected the price at which Financial Firm 2 agreed to sell, and sold, the bond and the price that

Investment Manager C agreed to pay, and paid, for the bond.

**Chan's Compensation During The Fraud**

69.     While engaged in the misconduct described above, Chan reaped significant gains in the form of incentive compensation from Nomura during the relevant period.

70.     Specifically, Chan received discretionary bonuses during this period that were based in significant part on the performance of the CMBS desk, which was inflated through his fraud.

**FIRST CLAIM FOR RELIEF**

**Violations of Section 17(a) of the Securities Act**

71.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 70.

72.     Defendant, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means of instruments of transportation or communication in interstate commerce, knowingly, recklessly, or negligently has: (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of a material fact or omissions of a material fact necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

73.     By reason of the foregoing, Defendant, directly or indirectly, singly or in concert, has violated, and unless enjoined will again violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5

74.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 70.

75.     Defendant, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of the means or instrumentalities of interstate commerce or of the mails, or of the facilities of a national securities exchange, knowingly or recklessly has: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

76.     By reason of the foregoing, Defendant, directly or indirectly, singly or in concert, has violated, and unless enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests a Final Judgment:

### I.

Permanently enjoining Chan from committing the violations of the federal securities laws alleged in this Complaint;

### II.

Ordering Chan to disgorge the ill-gotten gains he obtained as a result of the violations alleged in this Complaint, and ordering him to pay prejudgment interest thereon;

III.

Ordering Chan to pay civil monetary penalties pursuant to Section 20(d) of the Securities

Act [15 U.S.C. § 77t] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)]; and

IV.

Granting such other and further relief as the Court may deem just and proper.


Dated: New York, New York
       May 15, 2017

                                        Respectfully submitted,

                                        Andrew M. Calamari
                                        Sanjay Wadhwa
                                        George N. Stepaniuk
                                        Richard Hong
                                        Ladan F. Stewart
                                        Chevon N. Walker
                                        Counsel for Plaintiff
                                        Securities and Exchange Commission
                                        New York Regional Office
                                        200 Vesey Street, Suite 400
                                        New York, New York 10281-1022
                                        (212) 336-0956 (Hong)
                                        hongr@sec.gov